## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ELIANA SALZHAUER, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| THE COCA-COLA COMPANY, and FAIRLIFE, LLC, | |
| Defendants. | |

Plaintiff Eliana Salzhauer ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), brings this class action complaint against Defendants The Coca-Cola Company and Fairlife, LLC (collectively, "Fairlife" or "Defendants"). Plaintiff makes the following allegations upon personal knowledge as to her own acts, and upon information and belief and the investigation of her attorneys as to all other matters, and alleges as follows:

### NATURE OF THE ACTION

1.      Defendants produce, market, and sell a brand of milk products under the "Fairlife" label that are marketed as premium products (the "Products").

Central to Defendants' marketing of the Products is the representation that the cows that are part of producing the Products are treated humanely.

2.      Starting most egregiously with the name of Defendants' Products, "Fairlife," and throughout the labeling and marketing of Defendants' Products, the pervasive marketing scheme promises to reasonable consumers that the animals involved in producing the Products are treated humanely.

3.      For example, the packaging of the Products prominently states, under the heading "our promise," that the Products are a "one-of-a-kind milk" based on the goal of "making the world a better place." In bold font, Defendants promise: "Extraordinary care and comfort for our cows"; "Traceability back to our farms"; and "Continual pursuit of sustainable farming." Defendants also direct consumers to the Fairlife website—which makes additional claims about the humane treatment of animals—and invites consumers to "visit our flagship farm in Indiana so you can see for yourself!"

4.      Fairlife's entire marketing scheme focuses on the company's humane treatment of its dairy cows, and Fairlife specifically targets its advertising toward consumers who are willing to choose the Products and pay a price premium to guarantee that the dairy products they purchase are from animals that are humanely treated.

5.     Defendants' representations are false. Contrary to Defendants' representations, the Products are not derived from cows that are treated "fairly" or with "extraordinary care and comfort"; to the contrary, Defendants' dairy cows are not treated "fairly" at all—rather, they are the victims of horrendous animal abuse. The cruelty and suffering inflicted on the cows and calves at Fair Oaks Farms—the *flagship farm* for the Fairlife Products—was so significant that it has led to criminal charges being brought against three individuals.

6.     Plaintiff, and the many other consumers she seeks to represent, have been scammed by Defendants' false representations. Because consumers believed Defendants' claims about the humane treatment of animals at Fairlife farms— which were promised on the Products' labels and were duped into buying Products that were sold not as advertised. Plaintiff and the Class members (defined below) suffered financial injury because they bought Products they otherwise would not have bought, or for which they would have paid less. But beyond that, they were forced, through Defendants' deception, to unknowingly contribute to and participate in the infliction of cruelty on the Fairlife cows through their purchases of the Products. To remedy this wrongdoing, Plaintiff brings this class action to put a stop to Defendants' deceptive and unlawful practices and to recover financial compensation for their injuries.

# PARTIES

**Plaintiff**

7.      Plaintiff Eliana Salzhauer is a citizen of Florida, residing in Surfside,

Florida. During the past two years or more, Ms. Salzhauer purchased Defendants'

Products from Publix in Surfside, Miami Beach, or North Miami, Florida. Ms.

Salzhauer purchased four to six bottles of the Fairlife ultra-filtered Chocolate 2%

Reduced Fat milk in the 1.5-liter size every week. Prior to purchasing the Products,

Ms. Salzhauer reviewed the Products' labels and relied on the following Animal

Welfare Claims on the Products' labels:

1.5 Liter Label:

- ➢ "our promise"

- ➢ "The idea for this one-of-a-kind milk began at our kitchen table over 20 years ago. It was an ambition to provide the world with better nutrition while making the world a better place. Our fairlife® family farmers provide high quality, real milk, filtered for wholesome nutrition with exceptional care taken every step of the way."

- ➢ "Extraordinary care and comfort for our cows"

- ➢ "We'd love to have you visit our flagship farm in Indiana so you can see for yourself!"

8.      Reasonably relying on these representations, Ms. Salzhauer paid an

increased cost for the Products, which were worth less than represented because

the statements were not true and were highly misleading. Defendants'

representations were part of the basis of the bargain in that Ms. Salzhauer

4

attributed value to these promises and would not have purchased the Products, or would not have purchased them on the same terms, if she knew the truth about Defendants' abuse of their milk cows. Should Ms. Salzhauer encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action of their treatment of cows and correct the Products' labels, pricing, or treatment of its animals, Ms. Salzhauer would consider buying the current formulations of the Products in the future, as she is a regular milk purchaser.

**Defendants**

9.      Defendant Fairlife, LLC, is a Delaware limited liability company with its principal place of business located in Chicago, Illinois.

10.      Fairlife, LLC, manufactures, markets, and sells the Products throughout the United States.

11.      Fairlife, LLC, is a joint venture owned by The Coca-Cola Company ("Coca-Cola") and Select Milk Producers, Inc.

12.      Defendant The Coca-Cola Company is a Delaware corporation with its principal place of business located in Atlanta, Georgia.

13.      The Coca-Cola Company markets and distributes the Products throughout the United States.

14.    In marketing the Products on its website, The Coca-Cola Company refers to the Products as one of its "brands."[1]

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

16.    The Court has personal jurisdiction over The Coca-Cola Company because it resides and is subject to general jurisdiction in this District. The Court has personal jurisdiction over Fairlife, LLC, because it markets, distributes, and sells the Products throughout the United States, including in this District, and the conduct complained of occurred in or was targeted at this District.

17.    Venue is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because Defendants are subject to personal jurisdiction in this District. 28 U.S.C. § 1391(b)(2)-(3).

## FACTUAL ALLEGATIONS

### Coca-Cola's Partnership with Fairlife

18.    In 2011, sales of major carbonated soft drinks were declining, affecting the bottom lines of companies like Coca Cola.  Eager to increase sales of

---

[1]    *fairlife*, The Coca-Cola Company, https://www.coca-colacompany.com/brands/fairlife (last visited June 13, 2019).

its product lines, in 2012, Coca-Cola formed a partnership with Select Milk

Producers that would "rain[] money" for Coca Cola.[2]

19.    Fairlife's former CEO Stephen Jones, who is also a former Coca Cola

executive, publicly acknowledged that Coca Cola's sale of a premium milk product

would help Coca Cola's bottom line by also reversing declining milk consumption.

Betting on a premium milk product, Coca Cola hoped that Fairlife would be a

significant driver of sales growth.

20.    Coca-Cola has, at all times relevant to this lawsuit, including to this

day, maintained control over Fairlife—including regulating animal welfare,

"ensur[ing] [that the dairy farmers] uphold the highest standards of animal

welfare," and demanding that Fairlife conduct audits of dairy suppliers.[3]

21.    Coca-Cola's control over its suppliers includes enforceable

Sustainable Agriculture Guiding Principles, and Supplier Guiding Principles, as

well as an internal auditing process, all of which were in place throughout its

relationship and ownership of Fairlife.

---

[2]    Coke Bets on "Premium Milk" to Boost Declining Category, *available at* https://www.agweb.com/article/coke-bets-on-premium-milk-to-boost-declining-category-naa-associated-press/.

[3]    The Coca-Cola Company, *Taking Action to Address Animal Abuses at Fair Oaks Farms* (June 6, 2019), https://www.coca-colacompany.com/press-center/company-statements/coca-cola-company-statement-regarding-fair-oaks-farms.

**Animal-Welfare Claims Are Central to Defendants' Marketing**

22.    Defendants' Products are named "Fairlife." This prominent claim—namely the brand itself—means to reasonable consumers that the Fairlife dairy cows are treated "fairly." Further, Defendants devote an entire side of the packaging to telling the story about how humanely Fairlife dairy cows are treated, and make nearly identical animal welfare claims on the labeling and packaging of all of the Products.

23.    The packaging invites consumers to "LEARN OUR STORY" at fairlife.com. Below that, Defendants make a lengthy promise to treat Fairlife dairy cows humanely.

24.    This representation is captioned with the heading "our promise," which is in bold font.

25.    Below the "our promise" heading, Defendants state that the Product is a "one-of-a-kind milk" arising out of "an ambition to provide the world with better nutrition while making the world a better place." It then states that Fairlife farmers take "exceptional care . . . every step of the way."

26.    Next is a bullet-point list, in bold font, which states:

- "Extraordinary care and comfort for our cows"

- "Exceptional quality milk standards"

- "Traceability back to our farms"

- "Continual pursuit of sustainable farming"

27.     Defendants then invite consumers to "visit our flagship farm in Indiana so you can see for yourself!" This refers to Fair Oaks Farms, where the Animal Recovery Mission ("ARM") uncovered pervasive practices of animal abuse.

28.     This side of the labeling is depicted below:



29.    Defendants' message that animal welfare is paramount to Fairlife operations is reinforced by the front of the labeling, which includes a stylized drawing of a cow's face. The cute drawing—reminiscent of an illustration in a children's book—encourages consumers to conclude that the animal is healthy and happy.

30.    Of course, the name "Fairlife" reinforces Defendants' animal-welfare message. Among the recognized meanings of the word "fair" are "marked by impartiality and honesty"; "conforming with the established rules"; "not stormy or foul"; "pleasing to the eye or mind"; and "clean, pure."[4] Particularly when coupled with a stylized drawing of an apparently happy, well-treated cow, the very name "Fairlife" suggests to reasonable consumers that Fairlife's animals are treated "fairly."

31.    The front of the labeling is depicted below:

---

[4]    *Fair*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/fair (last visited June 12, 2019).



32.     Defendants' animal-welfare representations are also reinforced by the animal-welfare claims on the Fairlife website. As noted above, the "our promise" side of the labeling invites consumers to "LEARN OUR STORY" at the Fairlife website, fairlife.com.

33.     The Fairlife website reinforces this animal-welfare branding and messaging.

34.    Prior to the public revelations of animal abuse (discussed in more detail below), the Fairlife website contained a lengthy description of all the steps taken to make sure Fairlife dairy cows and calves were treated well.

35.    Prior to the public revelations of animal abuse in early June 2019, the Fairlife website featured an "OUR PROMISE" page that stated, in relevant part:

a.    "We believe in doing better every step of the way, because it's the right thing to do. For us, 'better' means growing our own crops and putting our cows' well-being at the top of our list."

b.    "As dairy farmers, we treat our cows with the utmost care, because we know that their health and happiness are the foundation of our business. We grow the crops that feed our cows so we can ensure that they're getting high quality nutrition. We invite you to our flagship farm in Fair Oaks, Indiana, to see just how we do it."[5]

36.    Prior to the public revelations of animal abuse in early June 2019, the Fairlife website featured an "Our Farms" page that stated, in relevant part:

---

[5]    This is from the version of the Fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/ (last visited June 12, 2019).

a.      "**BEST** *in* **CLASS ANIMAL CARE**: Co-founder Mike McCloskey got his start as a veterinarian specializing in dairy cows, so we know how important it is to put our cows' needs first. And since comfortable, healthy cows produce better quality milk, they reward us with some of the best milk in the industry."[6]

37.     Prior to the public revelations of animal abuse in early June 2019, the Fairlife website featured an "Animal Care" page that stated, in relevant part:

a.      "**IT'S** *all* **ABOUT HER**: Our co-founder Mike McCloskey started his career as a cow veterinarian before turning to dairy farming, and under his care and guidance, we know that nothing is as important to us as the health and well-being of our animals. Our world revolves around making sure that our cows are fed well, treated humanely and live in comfortable, stress-free conditions."

---

[6]     This is from the version of the Fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/our-farms/ (last visited June 12, 2019).

b.     "**SPOILED** *from the* **VERY START**: Newborn calves are visually monitored daily and are given immediate and proper medical treatment should they become ill."

c.     "**COMFORTABLE** *at all* **TIMES**: She and her friends have comfortable beds and freestanding stalls, allowing them to walk freely while being protected from harsh weather. In the winter we keep wind and the elements out of their living areas by closing the curtained sidewalls of the barns. Cows love to stay cool, so in the warm summer months we use fans to maintain a 7 mph breeze over the feed manger and over the cows' beds. We also spray our cows' skin with water many times a day in order to keep their body temperature down."

d.     "**ALWAYS** *in* **GOOD HANDS**: We spend a significant amount of time training all of our employees not only in proper animal husbandry but also indoctrinating them as to why we will accept nothing less than the utmost care, respect and humane treatment of our cows."[7]

---

[7]     This is from the version of the Fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/animal-care/ (last visited June 12, 2019).

38.     In addition, prior to the public revelation of animal abuse, the website for Fair Oaks Farms linked to the farm's Facebook page, which explicitly stated that bull calves were not sent to be turned into veal. In a response posted on the Fair Oak Farms website, Mike McCloskey has now acknowledged that the representation regarding bull calves was untrue.[8]

39.     After the public revelation of widespread animal abuse at Fair Oaks Farms, Fairlife changed its website to remove some of the most blatant misrepresentations. Nevertheless, the Fairlife website still claims that animal welfare is an important part of its philosophy and operations. For example, the current Fairlife website states, in relevant part:

    a.     "**FAIRLIFE PROMISES AND ETHICAL PRACTICES**: We recognize that now more than ever we need more rigorous auditing and verification of our milk suppliers' practices when it comes to cow well-being."

    b.     "*cow care*: Our suppliers' cows' health and happiness are the foundation of the what we do. To better protect cows, we are increasing our investment in animal welfare actions, requiring training, certification and support programs for supplying

---

[8]     *Official Statement From Our Founder Mike McCloskey On The ARM Video Release*, Fair Oaks Farms, https://fofarms.com/post/response/ (last visited June 13, 2019).

farmers, so they can set the standard in the best practices in animal well-being. We are enhancing our farm monitoring policy, significantly increasing the number of animal welfare audits to 24 audits per year in cooperation with Select Milk Producers, all of which will be unannounced."[9]

40.    Prior to the discovery of animal abuse, the Coca-Cola website also corroborated that the welfare of Fairlife cows is one of the critical aspects of the Products. For example, one prominently displayed marketing article about the introduction of the Products to the Canadian market referred to "high-quality milk and animal care practices, which pair well with the premium standards and passion for quality fairlife is known for."[10]

41.    Another marketing article prominently displayed on the Coca-Cola website before the discovery of animal abuse, entitled *From Staple to Superfood: How fairlife's Belief in Better Milk is Shaking Up the Dairy Aisle*, repeatedly emphasized Defendants' animal-welfare claims:

---

[9]    *Our Promise*, Fairlife, https://fairlife.com/our-promise/ (last visited June 12, 2019).

[10]    This is from the version of the Coca-Cola website that existed on July 12, 2018, according to the Wayback Machine, *available at* https://web.archive.org/web/20180612212301/https://www.coca-colacompany.com/stories/fairlife-ultrafiltered-milk-coming-to-canada (last visited June 13, 2019).

a.  "We've always known that the better you treat an animal, the happier and more productive she is. It's a symbiotic relationship."

b.  "The McCloskeys formed the co-op of fellow family-owned farms in 2004, gradually building a network of progressive farmers who share their 'grass to glass' commitment to milk quality, animal care and environmental sustainability. All fairlife products can be traced back to the dairies their milk comes from."

c.  "When we share our story of how we treat our cows and focus on their comfort and care and creating a stress-free environment, that really resonates with people who visit our farm . . . ."[11]

42.  A reasonable consumer would understand from each of the representations described above that Fairlife's dairy farms prioritize animal welfare and treat their cows with the utmost care and kindness. Moreover, they are

---

[11]  This is from the version of the Coca-Cola website available on January 21, 2018, according to the Wayback Machine, *available at* https://web.archive.org/web/20180121142609/http://www.coca-colacompany.com/stories/from-staple-to-superfood-how-fairlifes-belief-in-better-milk-is-shaking-up-the-dairy-category (last visited June 13, 2019).

mutually reinforcing such that they work together to strengthen this message to consumers that Fairlife's cows are treated well.

**Defendants' Animal Welfare Claims Are False**

43.    On June 4, 2019, and on June 12, 2019, ARM released the results of an undercover investigation it conducted of Fair Oaks Farms.[12] Fair Oaks Farms is the "flagship farm" for the Fairlife brand that Defendants invite consumers to visit and hold out to the public as the exemplar of their commitments to animal welfare and transparency.

44.    An undercover investigator working for ARM was hired as a calf-care employee at Fair Oaks Farms. In that role, the investigator bottle fed newborn calves, assisted loading calves on transports, and disposed of dead calves. The investigator used surveillance equipment to capture the normal daily practices on the farm.

45.    ARM also placed an investigator in the milking areas of Fair Oaks Farms, where day-to-day operations with cows took place.

---

[12]    The results of ARM's undercover investigation are available at https://animalrecoverymission.org/wp-content/uploads/2019/06/Operation_Fair_Oaks_Farms_Dairy_Adventure.pdf (last visited June 12, 2019).

46.    ARM's investigator found "extreme animal abuse" that was evidently "the normal way to do business at Fair Oaks Farms." Daily or commonplace practices included:

    a.    Separating calves from their mothers soon after birth (distressing both animals);

    b.    Throwing calves in and out of their huts;

    c.    Dragging calves by their ears (including from a motorized card) or by their tails and legs;

    d.    Pushing, throwing, slapping, kicking, and slamming calves to the ground if the calves did not nurse from the artificial rubber nipple during the feeding process;

    e.    Dumping formula on the ground instead of feeding it to calves, thereby denying them the appropriate nutrition and hydration needed to survive;

    f.    Ignoring the numerous emaciated cows, which had a body score of two or three on the nine-point scale;

    g.    Maintaining calves in filthy conditions;

    h.    Joking with other employees while sitting on top of a calf, whose legs buckled because they could not support the extra weight;

    i.      Stabbing and hitting calves with objects including steel rebars, hard plastic milking bottles, steel branding irons;

    j.      Burning calves' faces and bodies with hot branding irons;

    k.      Breaking tails of cows who would not move in the milking parlor;

    l.      Kicking, beating, punching, pushing, and otherwise abusing cows;

    m.      Pinning cows inside milking-carousel machinery and allowing them to fall out of it;

    n.      Dragging downed cows with straps who were too sick or weak to walk;

    o.      Packing cows into overcrowded housing; and

    p.      Denying medical care to sick cows, including downers that were left to die slowly.

47.    None of the problematic footage found by the ARM investigation took place in areas open to the public.

48.    The ARM investigation is also notable for what it did *not* find. The investigator never observed disciplinary action being taken against any employee, even though knowledge of the animal abuse was known and perpetuated at all

levels of employment, including foremen and upper management. Law enforcement was never contacted or notified.

49.    The investigator found no medical attention paid to calves or cows, even though the Fairlife website claimed the contrary. Medical attention was not provided even when temperatures in the calves' hutches reached 110 degrees Fahrenheit.

50.    Adult cows that became sick or injured also did not receive treatment. When adult cows were too sick to produce milk, they were shot or left to languish and die slowly. When the animals were shot, small-caliber bullets were improperly used by untrained workers. As a result, the cows frequently suffered for hours before they died.

51.    ARM's investigator received training related to the transportation of dead calves. Employees were instructed to "always take the back dairy roads while transporting the dead to a hidden dump area" to prevent any tourists or tour buses from seeing the workers disposing of the dead animals.

52.    Male calves were sold to veal farms—contrary to Fair Oaks Farms' promise that this would not be done—where they were held in such small enclosures that they were unable to turn around and were forced constantly to stand in their own feces.

53.     As a result of the ARM investigation, the Newton County Sheriff's Office (Indiana) launched an investigation of its own. Newtown County prosecutors have filed criminal charges against three individuals for animal cruelty (a Class A misdemeanor) and torturing or mutilating a vertebrate animal (a Class 6 felony). Prosecutors have issued arrest warrants and arrested at least one individual. The investigation is still active and ongoing.

54.     On June 6, 2019, Fairlife, LLC, issued a statement acknowledging the ARM investigation, admitting the truth of its allegations, and apologizing for its failures. Fairlife, LLC, stated that it was "devastated by the abuse that was recently discovered at Fair Oaks Farms." It also indicated it was discontinuing the use of milk from Fair Oaks Farms, increasing animal-welfare requirements, and seeking further audits by industry representatives.[13] The current Coca-Cola website also references these events and refers to the Fairlife website.[14]

55.     Coca-Cola, for its part, stated that, in addition to "conducting [its] own independent investigations of all fairlife's dairy suppliers to ensure they uphold the highest standards of animal welfare," stated that it was "taking action to

---

[13]     *Fairlife Statement on Animal Care*, Fairlife, https://fairlife.com/news/fairlife-statement-regarding-arm-video/ (last visited June 12, 2019).

[14]     *fairlife*, The Coca-Cola Company, https://www.coca-colacompany.com/brands/fairlife (last visited June 13, 2019).

ensure that internationally recognized animal welfare standards are appropriately enforced through our Sustainable Agriculture Guiding Principles, our Supplier Guiding Principles and our auditing processes."[15]

## Animal Welfare Is Material to Consumers

56.    Meat and dairy companies increasingly make animal-welfare claims about their products because they have discovered those claims increase sales, allow them to charge higher prices, or both. Animal-welfare claims are profitable because consumers care about the treatment of the animals that their food comes from. Consumers are more likely to buy a product, and will pay more for it, if the animals it is comes from were treated humanely.

57.    Numerous studies conducted by third parties have confirmed the fact that animal welfare matters to consumers.

58.    In one survey published in 2010, 68% of consumers agreed or strongly agreed they would like to know more about "ways [farmers] ensure animal care."[16] That was the second-highest rate of agreement with any survey question, behind only "measures used to produce safe food."

---

[15]    *Taking Action to Address Animal Abuses at Fair Oaks Farms*, The Coca-Cola Company, https://www.coca-colacompany.com/press-center/company-statements/coca-cola-company-statement-regarding-fair-oaks-farms (June 6, 2019).

[16]    *What "Indicator Consumers" Want to Know Most About How U.S. Foods Are Produced*, SEGMENTrak (June 2010), *available at* http://demetercommunications.com/wp-

59.    Another 2010 study found "that consumers desire high standards of animal care, even if it raises food prices and involves government regulation."[17]

60.    A study published by the Animal Humane Association in 2014, indicated that concerns may be increasing among consumers. For instance, it found that 94.9% of survey participants "stated they were very concerned about farm animal welfare," up from 89% the year before. Similarly, "75.7% stated that they were very willing to pay more for humanely raised meat, dairy and eggs," which was an increase from 74% the year before. Additionally, the most important labeling attribute to consumers was "humanely raised," including over labels such as "antibiotic free," "natural," and "organic."[18]

---

content/uploads/2011/05/FINAL.Demeter.SegemenTrak.Full_Report.June2010.pdf (last visited June 12, 2019).

[17]    RW Prickett et al., *Consumer Preferences for Farm Animal Welfare: Results from a Telephone Survey of US Households*, Animal Welfare (Aug. 2010), *available at* https://www.ingentaconnect.com/contentone/ufaw/aw/2010/00000019/00000003/art00015 (last visited June 12, 2019).

[18]    *2014 Humane Heartland Farm Animal Welfare Survey*, *available at* https://www.americanhumane.org/app/uploads/2016/08/2014-humane-heartland-farm-survey.pdf (last visited June 12, 2019).

61.    Wal-Mart announced in 2015 that its own research shows that 77% of its shoppers would increase their trust of, and 66% would increase their likelihood to shop at, a retailer that improved the treatment of livestock.[19]

62.    One 2018 survey found that 77% of consumers were concerned about animal welfare as it relates to their food, more than 66% of consumers paid some or a lot of attention to food labels regarding how the animal was raised, and over 70% of retailers stocking products with humane claims reported increased sales.[20]

63.    Fairlife, LLC, itself has acknowledged the importance of animal welfare to its consumers. In an interview conducted after public revelation of animal abuse at Fair Oaks Farms, Fairlife COO Tim de Doleman stated that "this whole company . . . [is] built on great animal welfare."[21]

64.    Accordingly, Fairlife's marketing of its Products as humanely treating the animals used to produce the Products is material to the reasonable consumer. Reasonable consumers would not expect that Products labeled with the promises

---

[19]    Christine M. Boynton, *Wal-Mart's Push on Animal Welfare Hailed as Game Changer*, Fox 5 News, https://foxbaltimore.com/news/local/wal-mart39s-push-on-animal-welfare-hailed-as-game-changer (last visited June 12, 2019).

[20]    Alicia Kelso, *Consumers Are Willing to Pay a Premium for Animal Welfare Certifications*, Grocery Dive (July 17, 2018), https://www.grocerydive.com/news/grocery--consumers-are-willing-to-pay-a-premium-for-animal-welfare-certifications/533852/ (last visited June 12, 2019).

[21]    *Fairlife COO Speaks Out After Release of Undercover Videos*, NBC Chicago (June 7, 2019), https://www.nbcchicago.com/multimedia/web-fairlife-coo-interview_Chicago-510995412.html (last visited June 13, 2019).

by Fairlife discussed herein would be produced through inhumane treatment of animals as described above.

65.    The marketplace's reaction to the public revelation of animal abuse at Fair Oaks Farms further demonstrates the importance to consumers of humane animal treatment. Numerous retailers have stopped selling the Products as a result of the animal abuse.

## CLASS ACTION ALLEGATIONS

66.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings this lawsuit on behalf of herself and on behalf of following Class and Subclasses, which unless otherwise specified are referred to collectively as the "Class":

>    a.    Nationwide Class: All persons who purchased the Products within the United States and within the applicable statute of limitations period.

>    b.    Florida Subclass: Also persons who purchased the Products within the State of Florida and within the applicable statute of limitations period.

67.    Excluded from the Class are Defendants, including their parents, subsidiaries, affiliates, officers, and directors; those who purchased the Products for resale; all persons who make a timely election to be excluded from the Class;

and the judicial officers and staff to whom this case is assigned and any immediate family members thereof.

68. **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendants have sold many thousands of units of the Products to Class members.

69. **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether the representations discussed herein that Defendants made about the Products were or are true, misleading, or likely to deceive a reasonable consumer;

b. Whether the representations discussed herein were material to a reasonable consumer;

c. Whether Defendants' conduct violates public policy;

d. Whether Defendants engaged in false or misleading advertising;

e. Whether Defendants' conduct constitutes violations of the laws asserted herein;

f. Whether Plaintiff and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

      g.    Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

70.   **Typicality:** Plaintiff's claims are typical of those of the other Class members' because, among other things, Plaintiff and all Class members were comparably injured through the uniform conduct described herein.

71.   **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiff and her counsel.

72.   **Declaratory and Injunctive Relief:** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

73.   **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be

required to individually litigate their claims against Defendants, making it

impracticable for Class members to individually seek redress for Defendants'

wrongful conduct. Even if Class members could afford individual litigation, the

court system could not. Individualized litigation creates a potential for inconsistent

or contradictory judgments, and increases the delay and expense to all parties and

the court system. By contrast, the class action device presents far fewer

management difficulties, and provides the benefits of single adjudication,

economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION[22]

## FIRST CLAIM FOR RELIEF

**Common Law Fraud**

**(On behalf of the Nationwide Class)**

74.     Plaintiff repeats and alleges the allegations in Paragraphs 1-73, above,

as if fully alleged herein.

75.     Plaintiff brings this claim individually and on behalf of the members

of the Classes against Defendants for intentional misrepresentation and fraud under

the common law.

---

[22] With the filing of this Class Action Complaint, Plaintiff has provided the
Defendants with notice of their violations under the Georgia Fair Business
Practices Act, O.C.G.A. § 10-1-390, *et seq.*  Plaintiff will seek leave to amend to
include this cause of action in the event Defendants do not remedy their unlawful
acts.

76.    As discussed above, Defendants made false and misleading animal-welfare claims on the labels of the Products, and Defendants failed to disclose material information facts about the Products, such as the fact that the milk is derived from cows that are systematically abused mistreated.

77.    The misrepresentations and omissions made by Defendants are material because Plaintiff and class members pay a price premium for the Products.

78.    The misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably rely, are intended to induce and actually induce Plaintiff and Class members to purchase the Products.

79.    Plaintiff and Class members were ignorant as to the falsity of Defendants' false and misleading animal-welfare claims and would not have purchased the Products, or would have paid significantly less for them, had they known the true facts.

80.    The Products Plaintiff and Class members received were worth less than the Products for which they paid.

81.    The fraudulent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

82.    As a result of Defendants' wrongful conduct, Plaintiff and the Class members have suffered and continue to suffer economic losses and other general

and specific damages, including amounts paid for the Products and any interest that would have been accrued on those monies, all in the amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Violation of 815 ILCS 505/1, *et seq*.

### (On behalf of the Nationwide Class as Against Fairlife)

83.    Plaintiff repeats and alleges the allegations in Paragraphs 1-73, above, as if fully alleged herein.

84.    The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of "unfair and deceptive practices" in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate that purpose.

85.    Plaintiff and Class members are consumers as defined in 815 ILCS 505/1(c) & (e).

86.    Fairlife intended that Plaintiff and Class members would rely upon its deceptive conduct, including the animal-welfare claims, and a reasonable person would in fact be misled by this deceptive conduct.

87.    Fairlife's misconduct, including the misrepresentations and the omission of material facts, took place in the course of trade or commerce in

Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

88.     In so doing the above, Fairlife has engaged in an unfair or deceptive act prohibited by the ICFA.

89.     If not for Fairlife's deceptive and unfair acts, including Defendants' false and misleading animal-welfare claims as alleged herein, Plaintiff and Class members would not have purchased the Products, or would have paid significantly less for them.

90.     Fairlife, at all relevant times, knew or should have known that Plaintiff and Class members did not know and could not have reasonably discovered its deceptive and unfair acts, including its false and misleading animal-welfare claims, prior to their purchases of the Products.

91.     As a direct and proximate result of Fairlife's violations of the ICFA, Plaintiff and Class members sustained damages in an amount to be proven at trial.

92.     In addition, Fairlife's conduct showed malice, motive, and the reckless disregard of the truth such that its violations of the ICFA entitle Plaintiff and Class members to statutory and actual damages, punitive damages, injunctive relief, attorneys' fees and costs, and all other relief allowed under the ICFA.

## THIRD CLAIM FOR RELIEF

### Violation of Fla. Stat. § 501.201, *et seq.*

### (On behalf of the Florida Subclass)

93.    Plaintiff repeats and alleges the allegations in Paragraphs 1-73, above, as if fully alleged herein.

94.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

95.    By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts in violation of Fla. Stat. § 501.204.

96.    Defendants' misrepresentations and omissions regarding the animal-welfare claims are material facts that a reasonable person would have considered in deciding whether to purchase (ort to pay the same price for) the Products.

97.    Defendants intended that Plaintiff and the Florida Subclass members would rely upon their deceptive conduct, including the Animal Welfare Claims, and that conduct has deceived Plaintiff and has deceived or is likely to deceive members of the consuming public and the Florida Subclass members.

98.    In addition to being deceptive, the business practices of Defendants were unfair, because the injuries to Plaintiff and the Florida Subclass members are

substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the Florida Subclass members or to competition under all of the circumstances. Moreover, the injury is not one Plaintiff and the Florida Subclass members could have reasonably avoided.

99.    Plaintiff and the Florida Subclass members justifiably acted or relied to their detriment upon Defendants' misrepresentations (and related omissions of fact), as evidenced by Plaintiff and Florida Subclass members' purchase of the Products.

100.   If not for Defendants' deceptive and unfair acts, including Defendants' false and misleading animal-welfare claims as alleged herein, Plaintiff and the other Florida Subclass members would not have purchased the Products, or would have paid significantly less for them.

101.   As a direct and proximate result of these unfair and deceptive commercial practices, Plaintiff and Florida Subclass members have been damaged and are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Fla. Stat. § 501.201, *et seq*.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (On behalf of the Nationwide Class)

102.    Plaintiff repeats and alleges the allegations in Paragraphs 1-73, above, as if fully alleged herein.

103.    Plaintiff and the other members of the Class conferred benefits on Defendants by purchasing the Products, including a price premium for the Products.

104.    Defendants have been unjustly enriched by retaining the revenues derived from Plaintiff and Class members' purchases of the Products. Retention of the monies under these circumstances is unjust and inequitable because Defendants' labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and Class members because they would not have purchased or would have paid less for the Products if the true facts were known.

105.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Plaintiff and the Class members seek restitution of all monies Defendants acquired from their unlawful conduct, including disgorgement of all profits and establishment of a constructive trust.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment against Defendants as follows:

1.      Certifying the Class as requested herein, designating Plaintiff as class representative and appointing the undersigned counsel as class counsel;

2.      Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

3.      Damages to the maximum extent allowed, in an amount to be proven at trial;

4.      Restitution and disgorgement of all profits and unjust enrichment Defendant obtained from Plaintiff and Class members as a result of Defendants' unlawful, unfair and fraudulent business practices;

5.      Injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

6.      Payment of Plaintiff's reasonable attorneys' fees, costs, and expenses;

7.      Pre- and post-judgment interest on any amounts awarded; and

8.      Such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: June 13, 2019

*/s/ Kenneth S. Canfield*

KENNETH S. CANFIELD
Georgia Bar No. 107744
kcanfield@dsckd.com
**DOFFERMYRE SHIELDS
CANFIELD & KNOWLES, LLC**
1355 Peachtree Street, N.E.
Suite 1725
Atlanta, Georgia  30309
Telephone: (404) 881-8900

ADAM J. LEVITT
alevitt@dicellolevitt.com
AMY E. KELLER
akeller@dicellolevitt.com
ADAM PROM
aprom@dicellolevitt.com
**DiCELLO LEVITT GUTZLER
LLC**
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois  60602
Telephone: (312) 214-7900

MELISSA S. WEINER
mweiner@pswlaw.com
JOSEPH C. BOURNE
jbourne@pswlaw.com
**PEARSON, SIMON &
WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota  55402
Telephone: (612) 389-0600

DANIEL L. WARSHAW
dwarshaw@pswlaw.com
**PEARSON, SIMON &
WARSHAW, LLP**

15165 Ventura Boulevard, Suite 400
Sherman Oaks, California  91403
Telephone: (818) 788 8300

MICHAEL R. REESE
mreese@reesellp.com
SUE J. NAM
snam@reesellp.com
CARLOS F. RAMIREZ
cramirez@reesellp.com
**REESE LLP**
100 West 93rd Street
Sixteenth Floor
New York, New York  10025
Telephone: (212) 643-0500

*Counsel for Plaintiff and the
Proposed Class*